**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| JOSH JOHNSON ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CASE NO.: _____** |
| ) | |
| GRAY MEDIA GROUP, INC. ) | |
| d/b/a WSFA ) | |
| ) | |
| **Defendant.** ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

**COMES NOW** Plaintiff Josh Johnson and files this Complaint for

Declaratory Judgment and Injunctive Relief pursuant to Rule 57 of the Federal Rules

of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. § 2201. In support

thereof, Plaintiff alleges the following:

**JURISDICTION AND VENUE**

1.     This Court has subject-matter jurisdiction over this action pursuant to

28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of

$75,000.00, exclusive of interest and costs, and is between citizens of different

states. The amount in controversy includes, without limitation, the value of

Plaintiff's lost earnings, diminished earning capacity, and the value of his right to

1

engage in his profession free from unlawful restraint, all of which exceed $75,000.00.

2.      Plaintiff Josh Johnson ("Plaintiff" or "Johnson") is a citizen of the State of Alabama for purposes of diversity jurisdiction.

3.      Defendant Gray Media Group, Inc. d/b/a WSFA ("Defendant" or "WSFA") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia, and is therefore a citizen of both the States of Delaware and Georgia for purposes of diversity jurisdiction.

4.      Complete diversity of citizenship exists between Plaintiff and Defendant, and no defendant is a citizen of the same state as any plaintiff.

5.      This Court has personal jurisdiction over Defendant because Defendant conducts business in the State of Alabama, purposefully avails itself of the privilege of conducting activities within Alabama, and the claims asserted arise out of or relate to Defendant's contacts with this forum.

6.      Venue is proper in the United States District Court for the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

7.      Venue specifically lies in the Northern Division of the Middle District of Alabama because the events giving rise to this action occurred within that Division and/or Defendant maintains a business presence therein.

2

8.     This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, to determine the rights, duties, and legal relations of the Parties under Alabama law.

9.     An actual, present, and justiciable controversy exists between Plaintiff and Defendant concerning the interpretation, scope, and enforceability of the restrictive covenant contained in the Parties' employment agreement.

10.     Plaintiff Johnson faces ongoing uncertainty and a credible threat of enforcement that chills lawful conduct, and declaratory relief is necessary to resolve that uncertainty and to determine the Parties' respective rights and obligations.

## FACTUAL HISTORY

### JOSH JOHNSON'S EDUCATION, CAREER, AND LIVELIHOOD IN BROADCAST METEOROLOGY

11.     Josh Johnson's career in meteorology is the result of a lifelong commitment to a highly specialized profession that he began pursuing at an early age and has practiced exclusively for more than two decades. Raised in Jacksonville, Alabama, Johnson developed an interest in weather as a child, inspired by significant and often devastating weather events that shaped his community, including the Blizzard of 1993, Hurricane Opal, and numerous tornado outbreaks. Those early experiences instilled in him both a fascination with atmospheric science and a deep

sense of responsibility to serve the public through accurate and timely weather forecasting.

12.     While still a teenager, Johnson sought out—and was accepted into—a mentor relationship with a respected Alabama meteorologist. That mentorship led to a professional internship and ultimately to a scholarship to Mississippi State University, one of the nation's premier institutions for broadcast meteorology.

13.     At Mississippi State, Johnson completed a rigorous curriculum in meteorology that included advanced coursework in physics, calculus, and atmospheric sciences, specifically tailored to prepare graduates for professional certification and on-air forecasting responsibilities.

14.     Remarkably, while still a sophomore in college, Johnson was hired as a part-time weekend meteorologist at WTOK-TV in Meridian, Mississippi. By the age of nineteen, he was already delivering live weather forecasts to the public while simultaneously completing his university degree. This early entry into broadcast meteorology highlights both his exceptional aptitude and his singular professional focus.

15.     After graduating from Mississippi State with a degree in broadcast meteorology, Johnson remained at WTOK-TV, where his responsibilities rapidly expanded. He was promoted to Chief Meteorologist, serving in that role for three (3) years. During that time, Johnson covered a wide range of significant and dangerous

weather events, most notably Hurricane Katrina, providing critical information to viewers during one of the most catastrophic natural disasters in U.S. history.

16. In 2007, Johnson was recruited to join WXIA-TV (11Alive) in Atlanta, Georgia, one of the largest and most competitive television markets in the country. There, he demonstrated versatility beyond daily forecasting by helping develop the station's "Storm Tracker" vehicle initiative, participating in school-based weather education programs, and strengthening the station's digital weather presence. While in Atlanta, Johnson also played a key role in live coverage during the historic Atlanta tornado of March 2008—another high-stakes event requiring immediate judgment and public-safety decision-making.

17. In July 2008, Johnson relocated to Montgomery, Alabama, when he joined WSFA's weather team. He initially served as the Morning Meteorologist, a demanding position requiring early hours, long preparation days, and continuous responsiveness to breaking weather events. Over nearly seven (7) years in that role, Johnson was instrumental in the station's transition to advanced, high-definition weather technology and helped spearhead the launch of WSFA's StormTracker 12 program. During this period, he was on the front lines of nearly every major Alabama weather emergency, including the historic tornado outbreaks of April 2011, multiple tropical systems, and other significant severe-weather events.

18.   In April 2015, Johnson was promoted to Chief Meteorologist of WSFA-TV, a position he has held continuously since that time. As Chief Meteorologist, Johnson has led the station's weather team through numerous life-threatening weather events, earning professional recognition, strong viewership trust, and regional and national acknowledgment for accuracy and leadership during crises. His responsibilities require him to continuously analyze vast volumes of meteorological data in real time, often issuing onair alerts before official National Weather Service warnings are released.

19.   This "First Alert" role places Johnson in a position where his judgment can directly affect public safety, property loss, and the preservation of life.

20.   Johnson holds professional certification from the American Meteorological Society, a distinction that requires years of verified on-air experience, peer review, and ongoing continuing education. He is also an active member of the National Weather Association and has served on its Weather and Forecasting Committee. These credentials reflect not only professional competence, but long-term dedication to maintaining the highest standards in broadcast meteorology.

21.   Importantly, Johnson has devoted his entire professional career exclusively to broadcast meteorology since entering the workforce in 2002. Meteorology is the only profession or trade Johnson knows; he has no secondary

profession, no alternative trade, and no transferable career path outside of this specialized field. Ironically, the same focused education and experience that enabled his success also significantly limits his employment alternatives. His academic credentials do not qualify him for positions with the National Weather Service, and his professional identity is inseparably tied to on-air forecasting within local television markets.

22.     In short, meteorology is not simply how Josh Johnson earns a paycheck. Johnson's career in broadcast meteorology is not incidental, transitional, or replaceable. It is the product of a single-minded vocational commitment that began in childhood, matured through specialized education and early professional immersion, and has continued uninterrupted for more than twenty years. Meteorology is the only profession for which Johnson has trained, the only work he has ever performed, and the sole means by which he earns a living. Any restriction that prevents him from continuing to work in this field imposes an undue hardship on him by directly threatening his ability to earn a living and undermines a career defined by public service, specialized expertise, and unwavering commitment to the people of Alabama.

### CHOOSING FAMILY WHEN NO OTHER OPTIONS REMAINED

23.     In early 2026, Johnson made the difficult decision to leave traditional broadcast television altogether due to difficult circumstances beyond his control.

This decision was driven by two deeply personal and interrelated factors, each reflecting Johnson's longstanding commitment to his family. First, Johnson's aging parents are both in serious and progressively declining health. For an extended period, he has undertaken the demanding responsibility of frequently traveling approximately two and one-half hours each way, often weekly or more, to provide direct care, support, and assistance to his mother while also attending to his father's deteriorating condition. These trips were made consistently and conscientiously, despite the significant strain imposed by his demanding professional obligations and the unavoidable time taken away from his two young stepchildren. Johnson accepted these sacrifices without complaint, determined to meet his family responsibilities even at great personal cost.

24.    That delicate balance collapsed when WSFA implemented a new and significantly more time-intensive streaming strategy. The expanded workload materially increased Johnson's professional demands and eliminated what little flexibility he had managed to preserve. The cumulative effect of these changes was profound: Johnson found himself unable to adequately fulfill his essential caregiving responsibilities to his parents or maintain a meaningful presence in his children's daily lives. The situation became unsustainable through no fault of his own.

25.     Compounding these pressures, Johnson was effectively precluded from seeking alternative broadcast employment closer to his parents due to a binding custody arrangement governing his wife's two minor children. Under the existing decree, the children alternate residency on a strict week-on, week-off basis between Johnson's household and their biological father, who resides in the Montgomery area. The decree requires notice of any proposed relocation and permits the children's father to object and seek a modification of custody—an objection he has indicated he would pursue. In practical effect, neither household can relocate without relinquishing custodial rights. As a result, Johnson was contractually and practically barred from relocating outside the Montgomery area, leaving him without any viable geographic or professional alternatives within traditional television media.

26.     Faced with no practical options, and unwilling to compromise the wellbeing of his children or abandon his ailing parents, Johnson made the exceedingly difficult decision to sever his relationship with WSFA and decline renewal of his employment contract upon its expiration. This decision was not made lightly, but rather as a last resort, necessitated by an untenable convergence of professional demands and irrevocable family obligations. WSFA publicly announced Johnson's departure on April 8, 2026. His last workday at WSFA was May 29, 2026. At present, Johnson has accepted an external affairs position with the State Emergency Management Agency performing no duties related to his

specialized field—an outcome that stops his professional growth in his field and is significantly below his prior level of compensation.

**THE OVERLY BROAD RESTRICTIVE COVENANT**

27.    Although Johnson and WSFA have entered into employment agreements over the years, the most recent agreement was executed on March 29, 2023. On that day, Johnson and WSFA entered into a News Personnel Employment Agreement (the "Agreement")—a contract reiterating and redefining his role, responsibilities, and compensation as Chief Meteorologist for WSFA. (*See* News Personnel Employment Agreement Standard Terms and Conditions and accompany Attachment, Ex. A).

28.    The Agreement contains a restrictive covenant that purports to prohibit Johnson, during his employment and for one year following termination for any reason, from performing "any activities that are the same as or similar to the Services" he performed for WSFA, or from authorizing or permitting the use of his name, image, voice, or recorded likeness "for or on behalf of any Competitor" competing with WSFA for viewers or advertisers within the defined Designated Market Area (the "DMA") without WSFA's prior written consent:

(11)  Restrictive Covenants. Employee agrees that, while employed by Employer and for the one-year period following termination of employment, regardless of the reason for termination:

    (a)  Employee shall not perform any activities that are the same as or similar to the Services (as defined above) or such other services as performed by Employee for Employer within the one-year period preceding the termination of employment *or*, make any personal appearances, or authorize or permit the use of his/her name, image, voice, sobriquet, biography, recorded performance, picture, portrait, caricature, electrical transcription, tape, digitized image, animated image, audio file, graphic file, text file, compact disc recording, web page or other recording or likeness for or on behalf of any Competitor without the express prior written consent of Employer (which consent may be withheld at Employer's discretion). For purposes of this Section, the term "Competitor" means any television station, radio station, cable television facility or program ***or any other video delivery system (including, without limitation, broadcast, cable, satellite or internet)*** that competes with Employer for viewers, advertisers or the like within all or any portion of the Designated Market Area ("DMA") of the Station (as currently defined by Nielsen Media Research). Employer and any entity that owns, is owned or controlled by, or licensed to, Employer is exempt from the definition of "Competitor".

(*See* Ex. A at Attachment A, ¶ 11(a)) (emphasis added).

### **The Illusion of Geographic Limitation**

29.  The covenant defines "Competitor" in extraordinarily broad terms to include not only traditional television, radio, or cable outlets, but also "***any other video delivery system***," expressly including the internet, which competes with Defendant "for viewers, advertisers or the like within all or any portion of the Designated Market Area ('DMA') of the Station." The definition is not limited to

11

entities physically located within the DMA, nor to platforms specifically targeting the DMA, but instead applies to any medium capable of being viewed within the DMA.

30.    The DMA, as defined by Nielson Media Research, is a "non-overlapping geographic region[ ] that group[s] counties based on television viewing areas." The Nielsen Company, "Need to Know: What is a Designated Market Area (DMA), and why does it matter?" (March 2025), https://www.nielsen.com/insights/2025/what-is-a-designated-market-area-and-why-does-it-matter/. Here, the DMA pertinent to Johnson's Agreement includes the following counties and geographical limitations: Autauga, Bullock, Butler, Crenshaw, Dallas, Elmore, Lowndes, Macon, Marengo, Montgomery, Pike, Tallapoosa, and Wilcox counties.

31.    As written, the restrictive covenant is activity-based and platform-based, rather than employer/competitor-based. It does not merely prevent Johnson from working for a competing television station. It purports to prohibit Johnson from performing the same or similar professional services—namely, weather forecasting and meteorological presentation—on any platform that could be accessed by viewers within the DMA.

32.   Because modern internet platforms such as YouTube, TikTok, Instagram, Facebook (Meta), Rumble, Twitch, and X (formerly Twitter) are globally accessible by default, all such platforms are necessarily available to viewers within the DMA. Johnson has no meaningful ability to exclude viewers located in the DMA from accessing publicly available internet content on these platforms. As a result, any weather forecasts or meteorological commentary Johnson posts on a public internet platform would, by definition, be available within the DMA.

33.   Under the plain language of the covenant, those platforms constitute "video delivery systems" that "compete for viewers" within the DMA simply by being accessible there. The covenant does not require any showing that Johnson intends to compete with WSFA, that his content is directed at the DMA, or that WSFA has suffered actual economic harm. Mere availability of content within the DMA is sufficient to trigger the restriction.

34.   The restrictive covenant nominally contains geographic limits, but it functionally extends beyond those limits. Although the restrictive covenant purports to confine its scope to WSFA's thirteen-county DMA, WSFA has redefined the core concept of "competition" in a manner that eviscerates any meaningful geographic boundary. Rather than limiting "Competitors" to local broadcast stations or similarly situated employers operating within the DMA, the agreement expansively defines a

"Competitor" to include "any other video delivery system (including, without limitation, . . . internet)" that competes for viewers or advertisers.

35. This definition departs dramatically from traditional notions of competition recognized under Alabama law. It is not limited to employers of a similar type, entities seeking to hire Johnson, or broadcasters producing substitutable weather content within the DMA. Instead, it sweeps in mass-market, third-party internet platforms—such as Facebook, Instagram, YouTube, and similar services—that merely host user-generated content and compete generally for attention and advertising. These platforms do not employ Johnson, do not receive meteorological services from him, do not directly compete with WSFA's newscasts, and do not trade on WSFA's goodwill. Nonetheless, under WSFA's definition, they qualify as "Competitors" despite being untethered to competition.

36. The practical consequence of this definition is that the covenant no longer operates as a territorially limited restraint tied to a specific market. Internet-based platforms are ubiquitous and worldwide in reach. They are accessible everywhere, including within WSFA's DMA, regardless of where content is created or where the content creator resides. As a result, any use of an internet platform—no matter how personal, noncommercial, or geographically removed—necessarily becomes conduct "for or on behalf of" a so-called "Competitor" simply because the platform is accessible in the DMA.

14

37.    In this way, the covenant's purported thirteen-county geographic limitation becomes meaningless. The prohibition does not stop at the boundary of the DMA; instead, it follows Johnson wherever the internet exists. Because internet platforms are universally accessible within the DMA, WSFA's definition transforms a facially local restriction into a de facto global restraint. As applied, the covenant effectively bars Johnson from engaging in meteorological communication on any internet platform anywhere in the world for a full year following his termination.

38.    Alabama law does not permit such a result. A restrictive covenant cannot be rendered reasonable by reciting a geographic limitation that is nullified by the scope of the prohibited activity. When the functional reach of the restraint extends worldwide, the covenant is unreasonable in geographic scope, regardless of how it is labeled. The law looks to practical effect, not contractual artifice.

39.    The overbreadth is further compounded by the absence of any internal limiting principles. The covenant does not require a showing of competitive harm, does not contain a carveout for personal or noncommercial activity, and does not require that the restricted conduct compete with WSFA's programming or exploit its goodwill. Instead, all use of modern internet platforms is swept within the prohibition, subject only to WSFA's unilateral discretion to grant or withhold consent.

40.    As applied to internet-based platforms, the restrictive covenant therefore functions not as a reasonable non-competition agreement, but as a blanket prohibition on participation in the modern digital marketplace of ideas and information. It effectively prevents Johnson from using the primary means by which meteorologists and broadcasters now communicate with the public. Because Johnson cannot relocate outside the DMA and cannot provide meteorological content online without violating the covenant, he is effectively barred from his chosen profession for the duration of the restraint.

41.    In sum, WSFA's decision to redefine "Competitor" to include any internet-based video delivery system destroys the geographic limitation required under Alabama law and converts the covenant into an unreasonable, worldwide restraint. Such a covenant extends far beyond what is necessary to protect any legitimate business interest and unlawfully restrains Johnson's ability to engage in lawful meteorological work using modern and widely accepted forms of media. It is therefore void and unenforceable under Alabama law.

**PROHIBITION ON JOHNSON'S PERSONAL USE OF HIS NAME AND LIKENESS**

42.    The incredible overbreadth of the restrictive covenant is also compellingly demonstrated by its image ban. Taken as written, the restrictive covenant necessarily prohibits Johnson from posting any content on any internet platform, including purely personal photos on Facebook, even if unrelated to his

16

former duties. It presents an absolute image ban that prohibits Johnson from using his own name, image, and likeness on any third-party-provided internet-based platform even if the content is wholly unrelated to the services Johnson provided for WSFA. The restrictive covenant contains **no exception** for personal, noncommercial, or unrelated activity, such as the posting of family activity photos or video clips on Facebook or TikTok. Indeed, Johnson cannot cause or permit the "use of his[] name, image, voice, sobriquet, biography, recorded performance, picture, portrait, caricature, electrical transcription, tape, digitized image, animated image, audio file, graphic file," on any video delivery system without the express written consent of WSFA, which it has absolute and total discretion to withhold. Thus, under the plain language of the restrictive covenant, any act by which Johnson authorizes or permits the use of his name or image on an internet platform that qualifies as a "Competitor" is prohibited absent Defendant's prior written consent.

43. Notably, the covenant:

- Is not limited to employment-related content;
- Is not limited to commercial activity;
- Is not limited to professional appearances;
- Explicitly includes personal indicia such as image, picture, portrait, and biography; and
- Explicitly includes web pages, digitized images, and text files.

17

Thus, the covenant on its face regulates not only what Johnson does, but how and where his likeness appears, regardless of context or intent or whether the content is the same or similar to the Services he has provided for WSFA.

44.     In other words, posting a personal photograph of Johnson on his social media account, maintaining his profile picture, appearing in a family or social photograph uploaded to an internet platform, or maintaining a personal webpage containing his image would all violate the restrictive covenant absent WSFA's written consent. In practical effect, WSFA retains the unilateral power to prohibit Johnson from engaging in otherwise lawful professional activity unrelated to WSFA's operations.

45.     Moreover, the covenant's definition of "Competition" explicitly includes "internet" without limitation. The covenant does not distinguish between professional and personal platforms, employer-operated and third-party platforms, or commercial and non-commercial activity. Accordingly, any internet platform that delivers video content and seeks viewers—such as Facebook, Instagram, YouTube, TikTok, X, or personal websites—falls squarely within the contractual definition of "Competitor."

46.     By way of example, posting personal photos or videos on Facebook necessarily violates the covenant. When Johnson uploads a personal photo or video of himself to Facebook:

- He authorizes and permits the use of his image;
- The use occurs on a web page and as a digitized image or video file;
- Facebook qualifies as an "internet-based video delivery system;"
- Facebook unquestionably competes for viewers and advertisers within the DMA; and
- Therefore, the posting is "for or on behalf of a Competitor" as defined.

Crucially, nothing in the covenant requires that Johnson be paid; that Johnson perform services similar to his prior role; or that the content target WSFA's audience. The mere authorization of use of Johnson's image on an internet platform is sufficient to trigger a violation.

47. Thus, under the plain language of the restrictive covenant, Johnson may not post a selfie, upload a family photo, appear in a birthday video, update a profile picture, or maintain a personal webpage containing photos of himself. Indeed, the inclusion of "Web Page" and "Text File" eliminates any plausible contention that personal social media use is outside the Parties' contemplation given that a Facebook post is plainly a "web page" containing a "graphic file" and often a "text file." If enforced as written the covenant necessarily results in this rule: **"For one year following termination, the employee may not allow his image to appear anywhere on the internet without employer approval."** This includes social media platforms, personal websites, online photo albums, or group photos uploaded by third parties with his permission. This is not hypothetical, but rather the logical

19

consequence of WSFA's chosen drafting. Alabama law does not authorize restrictive covenants that control a former employee's personal use of his likeness, especially where such use is disconnected from commercial competition.

48. WSFA has not provided Johnson with assurance that personal internet activity unrelated to WSFA, broadcasting, or the services previously performed is permitted under the restrictive covenant. Instead, WSFA has taken the position that the restrictive covenant is enforceable according to its plain language and has not disclaimed the authority to withhold consent for Johnson's personal internet use. In fact, WSFA has specifically stated, "We expect Josh to adhere to all terms of his contract, including the noncompetition agreement, for the amounts of time specified therein."

49. Johnson now seeks a declaration from this Court determining that the restrictive covenant provided for in the 2023 Agreement is invalid, unenforceable, not narrowly tailored, and unlawfully restrains his ability to engage in his lawful profession. Specifically, this Court should declare that the restrictive covenant prohibiting Johnson from providing meteorological services to the general population via his own social media and digital platforms, while he lives in WSFA's DMA or casts to WSFA's DMA, is overbroad, invalid, and unenforceable.

20

50.    In addition to the profound personal and professional harm imposed on Johnson, enforcement of restrictive limitations that prevent him from practicing broadcast meteorology would also harm the broader community he serves. For more than two decades, Johnson has functioned not merely as a television personality, but as a trusted meteorological subject-matter expert for the River Region and surrounding areas. Viewers have come to rely on his experience, judgment, and local expertise during times when accurate, timely, and clear weather information is critical to public safety, and many have personally expressed their gratitude for the life-saving impact of his work.

51.    Johnson's deep familiarity with Alabama's unique meteorological patterns—including tornado-prone storm systems, tropical weather impacts, and rapidly evolving severe-weather outbreaks—cannot be easily replaced. His expertise is the product of decades of focused education, on-air experience, and firsthand coverage of the most severe weather events affecting the region. The loss of his skills, institutional knowledge, and professional judgment would deprive the River Region of an experienced and proven source of life-saving weather information, particularly during emergencies when public reliance on trusted local experts is at its highest.

21

52.    Restrictive enforcement that prevents Johnson from continuing to work in his field would therefore impose consequences extending well beyond the Parties to this dispute. It would reduce the availability of qualified, experienced meteorologists in the region and diminish the community's access to a professional who has repeatedly demonstrated the ability to interpret complex meteorological data and communicate urgent warnings clearly and decisively. Such a result runs counter to the public interest, which favors the continued availability of skilled professionals whose work directly impacts public safety and wellbeing.

53.    In sum, the restrictive covenant at issue threatens not only Johnson's sole livelihood and decades of professional investment, but also the River Region's continued access to a highly trained meteorological expert whose service has been relied upon during some of the most dangerous weather events in Alabama's recent history. These harms are ongoing, irreparable, and incapable of adequate remedy at law, further underscoring the necessity for declaratory and injunctive relief.

54.    This controversy directly affects Johnson's respective rights and obligations, including the enforceability of the Agreement's restrictive covenant, preventing him from practicing meteorology in any DMA, which effectively prohibits him from earning a living.

22

55.     Johnson now brings this action for declaratory relief to resolve the remaining ripe and justiciable controversy that exists between the Parties regarding the validity and enforceability of the restrictive covenant's prohibition on Johnson engaging in his profession via any internet video platform even when the intended audience is national or global and even when the content has no meaningful competitive impact on WSFA's local viewership.

56.     A declaratory judgment will resolve this controversy by clarifying the validity and enforceability of the Agreement's restrictive covenant, thereby eliminating uncertainty impairing Johnson's ability to practice in the meteorological field for one (1) year following his departure from WSFA.

**<u>COUNT I</u>**
**DECLARATORY JUDGMENT**
**(28   U.S.C. § 2201)**

57.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

58.     An actual, present, and justiciable controversy exists between Plaintiff and Defendant concerning the validity, enforceability, and permissible scope of the restrictive covenant contained in Plaintiff's March 29, 2023 News Personnel Employment Agreement.

59.     Plaintiff contends that the restrictive covenant is void, unenforceable, and unreasonable under Alabama law, including Ala. Code §§ 8-1-190 through 8-1-197, because it exceeds the scope of any permissible restraint, is not narrowly tailored to protect a legitimate business interest, and imposes an undue hardship on Plaintiff.

60.     Defendant contends that the restrictive covenant is valid and enforceable and has asserted, or has refused to disclaim, its right to enforce the covenant according to its terms.

61.     These adverse positions create a real and immediate controversy that is ripe for judicial determination.

62.     A declaration by this Court will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from the uncertainty and insecurity giving rise to this dispute.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

(a)     Declaring pursuant to 28 U.S.C. § 2201 that the restrictive covenant contained in Plaintiff's March 29, 2023 News Personnel Employment Agreement is void, invalid, and unenforceable under Alabama law, including Ala. Code §§ 8-1-190 through 8-1-197, because it is overbroad, not narrowly tailored to any legitimate business interest, and imposes an undue hardship on Plaintiff;

24

(b)    Declaring that the restrictive covenant is unenforceable to the extent it purports to prohibit Plaintiff from performing meteorological services, commentary, or related professional activity through internet-based platforms, social-media platforms, globally accessible digital media, or other third-party video delivery systems, including platforms not directed to or targeted at Defendant's DMA;

(c)    Declaring that the restrictive covenant is unenforceable to the extent it purports to prohibit or condition Plaintiff's personal, non-commercial use of his own name, image, voice, or likeness, including uses and media expressly enumerated in Paragraph 11(a) of the Agreement—such as any "name, image, voice, sobriquet, biography, recorded performance, picture, portrait, caricature, electrical transcription, tape, digitized image, animated image, audio file, graphic file, text file, compact disc recording, web page or other recording or likeness"—where such use is unrelated to Defendant, Defendant's programming, or the services previously performed for Defendant;

(d)    Permanently enjoining Defendant from enforcing or attempting to enforce the restrictive covenant in any manner inconsistent with this Court's declarations;

(e)    **Or, in the alternative**, should the Court decline to declare the restrictive covenant void in its entirety, declaring and ordering that the restrictive covenant be judicially modified or blue-penciled to remove from its scope:

25

(1)    Internet-based platforms, social-media platforms, globally accessible digital media, and other third-party video delivery systems; and

(2)    Any restriction on Plaintiff's personal, non-commercial use of his name, image, voice, or likeness, including the uses and media enumerated in Paragraph 11(a) of the Agreement;

(f)    Declaring the rights, status, and legal relations of the Parties consistent with such relief; and

(g)    Granting such other and further relief as the Court deems just and proper.

Respectfully submitted this the 1st day of June 2026.

/s/ Caitlin E. Cobb
**CAITLIN E. COBB (2959-B63E)**
**CHRISTOPHER W. WELLER (6640-W81C)**
*Attorneys for Plaintiff*

**OF COUNSEL:**
**CAPELL & HOWARD, P.C.**
150 South Perry Street (36104)
Post Office Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8000
Facsimile: (334) 323-8888
Email: Caitlin.Cobb@chlaw.com
Email: Chris.Weller@chlaw.com

26

**DEFENDANT TO BE SERVED BY CERTIFIED MAIL:**

Gray Media Group, Inc.
c/o C T CORPORATION SYSTEM
2 North Jackson St.
Suite 605
Montgomery, AL 36104